UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case Number 04-20038
        Honorable David M. Lawson

DAVID WARREN TICE, JR.,

        Defendant.
_____/

## ORDER DENYING MOTION TO SUPPRESS EVIDENCE

This matter is before the Court on the motion by the defendant, David Tice, to suppress evidence seized pursuant to a search warrant or, alternatively, for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Tice is charged along with several others in an indictment alleging various narcotics and firearms violations. On August 2, 2005, a fourth superceding indictment added conspiracy to commit murder to the charges against this defendant and two others; these three defendants face the death penalty on this count. The Court has been informed that the government conducted a meeting in February of this year to determine if it actually will seek the death penalty in this case. However, there has been no word whether a decision has been made, and the case is awaiting trial.

In the mean time, Tice has pursued his suppression motion. The defendant argues that FBI agent John B. Cecil included false information in the affidavit for the search warrant, and that much of the information was provided by an unreliable informant, David McWhorter. The government has admitted that one statement made by Agent Cecil in the affidavit was false. Other statements alleged by the defendant to be false, or at least misleading, were statements that "controlled buys" had been conducted, even though these instances were far from "controlled" due to a lack of

adequate surveillance for hours at a time. The Court held a hearing on the motion on January 5, 2006. At the hearing, the parties agreed that the affidavit could support a finding of probable cause, even if stripped of all allegedly false or misleading information, if the informant could be considered reliable. The Court determined that a hearing is not necessary to decide this issue because the relevant inquiry must be confined to the four corners of the search warrant affidavit, and the parties then sought leave to submit supplemental briefs on the informant's reliability. On January 6, 2006 the Court issued an order allowing the parties to submit supplemental briefs on the issue of the informant's reliability. The briefs were submitted, and the Court now finds that the search warrant affidavit contains sufficient information from which the magistrate could have concluded that the affiant's informant was reliable and probable cause existed to believe that contraband would be found at the defendant's house. Therefore, the motion to suppress evidence will be denied.

I.

The government alleges that defendant Tice is a member of a motorcycle gang known as the Fly-In-Wheels Motorcycle Club, which had a clubhouse in Harrison, Michigan. David Tice also had a residence in Harrison. Government agents suspected club members of engaging in various forms of criminal activity, including dealing in methamphetamine. The government recruited an informant who had access to the clubhouse and club members and pursued an investigation using this person over a period of ten months. The informant has been identified as David McWhorter.

On July 29, 2005, agent Cecil completed an affidavit that resulted in a search warrant that led to evidence in the case against Mr. Tice. Apparently, much of the evidence was seized from Tice's home in Harrison. The contents of the affidavit are set forth below. Paragraphs not related

to defendant Tice or otherwise not relevant to probable cause to search the defendant's home are omitted.

    2. During the course of my duties, I have come to know an informant referred to as FBI-1 [McWhorter]. FBI-1 came into contact with law enforcement authorities in October 2003 as a result of criminal charges facing FBI-1. FBI-1 agreed to cooperate with law enforcement authorities in exchange for leniency relating to those charges. FBI-1 stated that he/she was acquainted with several members of the Fly-In-Wheels Motorcycle Club (FWMC) and knew about their involvement in drug distribution and firearm offenses. Based on my experience the FWMC is considered an "outlaw" motorcycle gang that engages in several forms of criminal activity.

    3. FBI-1 subsequently reported information that he/she became aware of relating to various FWMC members. In December 2003, FBI-1 advised that he/she was present when FWMC member David Tice dropped off several ounces of methamphetamine for other FWMC members to use at a party in Flint, Michigan that was held earlier that month.

    4. FBI-1 also reported that he/she was present in January 2003 when FWMC member Donald York picked up a "softball" sized amount of methamphetamine in Harrison, Michigan at the residence of David Tice. York stated that the methamphetamine was intended for distribution. [The government admits this paragraph is false because the informant was not present.]

. . .

    6. Later in February 2004, FBI-1 was present when Donald York obtained additional amounts of methamphetamine from David Tice in Harrison.

. . .

    8. In March of 2004, FBI-1, while working under the supervision of the FBI, made a controlled purchase of methamphetamine from David Tice in Harrison, Michigan. FBI-1 met Tice at the FWMC clubhouse at 3600 North Old State Road in Harrison, Michigan and then went to Tice's residence at 3931 W. Monroe Street, Harrison, Michigan, where the drugs were actually picked up. FBI-1 observed a sale by Tice to another FWMC member named "Vic" during the time he was present. The drugs were tested and determined to be methamphetamine. The meeting between FBI-1 and Tice was partially taped.

    9. Later in March, FBI-1 was present when Donald York obtained a quantity of methamphetamine from David Tice at Tice's residence on W. Monroe in Harrison, Michigan.

    10. In early April 2004, FBI-1 was present when Donald York stated that he had been to Harrison on April 10, 2004 to obtain methamphetamine from David Tice and had seen 20 pounds of methamphetamine at Tice's residence.

    11. On April 29, 2004, FBI-1 made a controlled purchase of methamphetamine while working under the supervision of the FBI, from David Tice at 3931 W. Monroe Street, Harrison, Michigan. The meeting between FBI-1 and

> Tice was partially taped. The drugs were tested and determined to be methamphetamine.
> . . .
> 13. FBI-1 advised that he/she was present at the FWMC clubhouse in Harrison, Michigan on July 4, 2004 for a large party that was attended by many FWMC members. FBI-1 observed "Jay" distributing cocaine to numerous individuals and David Tice distributing methamphetamine to numerous individuals. FBI-1 observed numerous firearms stored at the FWMC clubhouse including shotguns and pistols. FBI-1 also stated that all FWMC members at the party were carrying handguns and Donald York bragged about obtaining a .44 caliber handgun that was not traceable.
> 14. FBI-1 also said during the party on July 4, 2004, David Tice stated he met with a "Mexican" and discussed obtaining kilo quantities of methamphetamine.
> 15. FBI-1 also stated that on July 4, 2004, he/she was present when David Tice packaged cocaine and methamphetamine at a residence in Harrison, Michigan that Tice said he owned and was going to allow his daughter to live in. FBI-1 later saw Tice distribute some of the methamphetamine to "Vic" at the FWMC clubhouse.
> 16. FBI-1 stated that the FWMC held a national meeting in Harrison, Michigan at the grounds of the FWMC clubhouse starting approximately July 23, 2004 and continuing to the present. FBI-1 stated on July 29, 2004 that he/she was at the location of the meeting on and off since July 23, 2004 and Tice was distributing quantities of methamphetamine to many, if not all, of the people present at the meeting. FBI-1 has been in the FWMC clubhouse and in several of the trailer structures during the period between July 23 and July 29, 2004, and observed quantities of drugs, which he believes to be methamphetamine, at all of those locations. FBI-1 also observed several fully automatic firearms on the clubhouse grounds during this period. During the evening of July 28, 2004, FBI-1 observed Donald York in possession of a .44 caliber revolver on the grounds of the FWMC clubhouse while apparently under the influence of drugs. In my experience it is extremely unlikely that any fully automatic firearms would be properly registered to any of these individuals under federal law.
> 17. The information provided by FBI-1 has been extremely reliable. The information has been confirmed by controlled purchases made by FBI-1, surveillance that was conducted as part of this investigation and a review of phone records from phones used by the individuals involved in these allegations.

Def.'s Mot. to Suppress Ex. 1, Cecil Affidavit.

The government concedes that paragraph four of the affidavit is false because the informant was not "present" when York obtained the drugs. However, the government states the inclusion of this information was "the product of inadvertence and not an attempt to mislead the issuing

-4-

magistrate." Govt.'s Resp. Br. at 7. The government states that York told the informant he obtained the methamphetamine from Tice at Tice's home. The parties also agree that paragraphs nine, ten and eleven would establish probable cause to search Tice's house if the informant could be deemed reliable.

II.

The Fourth Amendment provides that "no warrants shall issue but upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV. On the continuum between doubt and certainty, "[p]robable cause arises if there are 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "In order for a judicial officer to issue a warrant, law enforcement officials must present evidence from which the magistrate judge can conclude" that probable cause exists. *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Grubbs*, __U.S.__, 126 S. Ct. 1494, 1499 (2006).

The determination of probable cause by a magistrate must be based on the totality of the circumstances. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 646 (6th Cir. 2003). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). When asked to review that determination, a court is "limited to the information presented in the four corners of the affidavit." *Coffee*, 434 F.3d at 892 (citing *United States v. Frazier*, 423

F.3d 526, 531 (6th Cir. 2005). The review is deferential, and "an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

When the facts supporting a finding of probable cause come from a hearsay source, the magistrate must have some basis to assess the reliability of the declarant. The precedents do not prescribe any specific formula by which reliability is to be gauged, *Allen*, 211 F.3d at 975-76; as a general rule, however, the decisions have required either independent corroboration by law enforcement officials or some showing that the informant is otherwise reliable, such as a history of furnishing information that turned out to be accurate. *See Helton*, 314 F.3d at 819 (noting that "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information"); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999) (stating that "if the prior track record of an informant adequately substantiates his credibility, other indicia of reliability are not necessarily required"); *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (observing that "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration"). The Sixth Circuit recently explained in *Coffee*:

> [W]hile an affidavit must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form. The affidavit could state that police corroborated significant parts of the informant's story. Or the affiant could attest with some detail that the informant provided reliable information in the past. Or there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause. In sum, an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information.

*Coffee*, 434 F.3d at 893 (internal quotes and citations omitted).

In this case, the affidavit states that McWhorter, referred to as FBI-1, made two controlled purchases of narcotics, one of which was partially tape-recorded; some of the information he furnished was confirmed by surveillance (although there is no statement as to which information); and agent Cecil confirmed some of the information through telephone records. The defendant argues, however, that these statements are not sufficient to establish the informant's reliability to a neutral magistrate. The Court disagrees. Based on the affidavit alone, the information agent Cecil included is adequate to allow the magistrate to assess the informant's reliability and conclude that the information he furnished was sufficient to establish a fair probability that contraband or evidence of a crime would be found in Tice's house. Cecil averred that he had worked with the informant over a substantial period of time, and the informant bought drugs from Tice on two occasions "while working under the supervision of the FBI" under "controlled" conditions. These allegations both tend to show that the informant has a record of reliable performance and the information furnished was confirmed to some extent by Cecil's own investigation.

However, the defendant contends that the Court ought to look behind the allegations in the affidavit because the claims of agent Cecil as to the "controlled" nature of the purchases are overstated and the affidavit therefore misled the magistrate. As to the purchase referenced in paragraph eight of the affidavit, the defendant points out that Exhibit 6, a report by agent Cecil dated March 21, 2004, indicates that the informant picked up Donald York at a bar in Flint at 12:45 p.m. They drove around for several hours, making stops at a party store, a gas station, and a bar. The report does not indicate that the surveillance team ever saw the informant go to the defendant's home. The agents conducting the surveillance followed the source and York around and waited

-7-

outside the places they stopped. The agents abandoned surveillance at 3:40 p.m. because of the rural conditions of the area. Although the informant may claim he purchased drugs from Mr. Tice on this occasion, the defendant believes that telling the magistrate that a controlled buy took place is misleading. Agent Cecil apparently has no independent knowledge regarding where the drugs were obtained or from whom, and the defendant states the informant could have gotten them from anyone at any of the numerous places he stopped that day, including from York, who had previously sold drugs to the informant.

The defendant makes a similar argument with respect to paragraph eleven. He points to exhibit seven, a report by agent Cecil dated April 29, 2004, which describes the incident in question. That report states that the informant made multiple stops with periodic surveillance, and the informant was not under surveillance at all from 3:25 p.m. to at least 7 p.m., when the informant's motorcycle was "spotted" at the defendant's home. The report does not mention drugs at all. The defendant believes characterizing this incident as a controlled purchase is misleading and was done intentionally to persuade the magistrate to issue the warrant.

To accept the defendant's argument, the Court must have a reason to look beyond the four corners of the affidavit, which requires consideration of the jurisprudence spawned by *Franks v. Delaware*. Under *Franks*, if the defendant shows by a preponderance of evidence that a search warrant affiant committed perjury or made a statement in reckless disregard for the truth, the offending statements must be excised from the affidavit and probable cause reassessed. *Franks*, 438 U.S. at 155-56. However, incorrect statements due to mere negligence or innocent mistake are insufficient to void a warrant. *Id.* at 171; *see also United States v. Ayen*, 997 F.2d 1150, 1152 (6th

Cir. 1993); *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003). Such information need not be removed from the affidavit.

There is no Sixth Circuit case that sets out a definition of "controlled purchase." However, it appears that the term has acquired a meaning within investigative parlance that includes features designed to ensure that an informant is closely monitored and searched to ensure reliable investigative results. For instance, in *United States v. Laughton*, 409 F.3d 744, 746 (6th Cir. 2005), the court described the process as follows:

> Following a tip from confidential informant Thomas Pell that he was able to purchase methamphetamine from the defendant, James Laughton, the Isabella County Sheriff's Department arranged for Pell to make a controlled buy under surveillance. On November 1, 2001, Deputy Sheriff Scott Clarke and two other officers met with Pell to conduct the purchase. They provided him with $100.00 in marked money and patted him down to make sure that he was not carrying any of his own money or any other narcotics. They also searched his vehicle. Pell then drove to a residence to meet the defendant, and the police followed. The police observed Pell enter the house and re-emerge 10 to 20 minutes later. After Pell left the house, he drove to an arranged location, followed by the police, where he turned over methamphetamine that he reportedly had bought from Laughton for $100.00.

Similarly, in *United States v. Lattner*, 385 F.3d 947, 952 (6th Cir. 2004), the court summarized the informant's activity, which it characterized as a controlled purchase:

> On this date the affiant met with the SOI [source of information] to formulate plan to make a controlled purchase from the location of 2416 Monterey. The SOI was searched for money and narcotics with negative results. The affiant issued secret service funds and instructed the SOI to attempt a purchase of narcotics from the location of 2416 Monterey. The affiant observed the SOI go directly to the front door of the location, enter same and stay for a short period of time, then to return directly back to the affiant. The SOI returned and stated that the above seller told him (SOI) to come back later because he (seller) was out of cocaine.

Likewise, in *Rattigan v. United States*, 151 F.3d 551, 553 (6th Cir. 1998), the court described the "controlled purchases" as involving close surveillance, use of pre-recorded funds, and the immediate transfer of the controlled substance to the officer after the transaction was consummated. *See also*

*United States v. Clyburn*, 24 F.3d 613, 615 n.1 (4th Cir. 1994) (explaining that "a controlled purchase involves the following procedure: law enforcement officers search the informant to make sure that she does not have any illegal narcotics before the purchase; officers provide the informant with marked bills with which to purchase the drugs; officers place a body wire on the informant and monitor all conversations during the purchase; the informant is placed under visual surveillance during the purchase; and the informant turns over the contraband to the officers immediately after the purchase"); *United States v. Olson*, 978 F.2d 1472, 1475 n.3 (7th Cir. 1992) (stating that the "[s]tandard procedure for a DEA 'controlled buy' is to get approval for the disbursement, mark the bills, search the informant immediately before the buy, give him the money, keep him under surveillance as he enters and exits the premises, confiscate the drugs and search the informant again immediately after the exchange").

The Court agrees that agent's Cecil's characterization of the two incidents as "controlled purchases" tends to stretch the colloquially-accepted definition of the term. Using that term as a shorthand term-of-art has a tendency to describe more than actually occurred when many of the common features of controlled buys are lacking. By far, the better practice is to state in the affidavit what actually occurred, as exemplified by the affidavit described by the court in *Coffee*. *See* 434 F.3d at 894 (noting that "the details of the controlled purchase . . . were spelled out in the affidavit. . . . [T]he purchase was controlled and witnessed by Officer Adams, who searched the CI for money or contraband, provided the CI with pre-recorded funds, observed the CI enter and exit defendant's house, and then observed and tested the crack cocaine the CI purchased from defendant"). However, the Court is unable to conclude that agent Cecil made the statements in reckless disregard for the truth of what actually occurred in the field, or that he engaged in a

deliberate falsehood. Rather, there was some degree of surveillance on both occasions, and it appears that contact with the informant was made before and after the events, despite intervals of time when contact was lost. Under these circumstances, the Court does not find grounds to excise the challenged paragraphs (save paragraph four, of course). Therefore, the Court concludes that the affidavit contains a sufficient basis for the magistrate to find that the informant was reliable, and ultimately probable cause to search Tice's house.

III.

Because the affidavit furnished a proper basis to issue the search warrant, the resulting search of the Tice's premises at 3931 W. Monroe Street, Harrison, Michigan did not offend the Constitution.

Accordingly, it is **ORDERED** that the motion by defendant David Tice to suppress evidence [dkt # 82] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 30, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 30, 2006.

s/Felicia M. Moses
FELICIA M. MOSES